## REQUIREMENTS SUPPLY AGREEMENT

THIS REQUIREMENTS SUPPLY AGREEMENT (this "Agreement") is entered into this 15th, day of December, 2013 by and between HEAVY MATERIALS, LLC ("Vendor"), having its mailing address at 7865 Estate Mariendahl, St. Thomas, US Virgin Islands 00802 and SPARTAN CONCRETE PRODUCTS, LLC, having its mailing address at 9010 Cottage, Christiansted VI 00820 ("Buyer")

Vendor has agreed to sell to Buyer the products described in **Schedule A** attached hereto and made a part of this Agreement (collectively, the "Products") for use in Buyer's production and sale of ready-mix concrete on St. Croix, U.S. Virgin Islands (the "Buyer's Business") under the terms and conditions contained herein.

In consideration of the terms, covenants, conditions, promises, provisions and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1. **TERM.** This Agreement will commence on the later of the date signed by an authorized representative of Buyer or Vendor (the "Effective Date") and shall continue until and including October 31, 2018 ("Expiration Date"), unless terminated or extended as provided herein. The parties shall have two options to extend the term of this Agreement for an additional five (5) years and such option may be exercised by either party by sending written notice to the other party no later than 90 days prior to the Expiration Date. If either party exercises the first option, then the term of this Agreement and the Expiration Date shall be extended to be until and including October 31, 2023 on the same provisions (except that the Option to Purchase/Right of First Refusal contained in Section 8 only applies during the initial five year term and not during any option period). If the first option is exercised and either party exercises the second option, then the term of this Agreement and the Expiration Date shall be extended to be until and including October 31, 2028 on the same provisions.

2. **BUY/SELL AGREEEMENT.**

    A. Vendor agrees to sell to Buyer, and Buyer agrees to purchase from Vendor, all Products required for the Buyer's conduct of its ready-mix concrete business on St. Croix. This Agreement constitutes a "requirements" agreement as defined in Title 11A Virgin Islands Code §2-306. All aggregates and manufactured sand (all sizes required) (the "Produced Products") shall be delivered FOB the Vendor's quarry on St. Croix, located at No. 1 Estate Montpellier, with Buyer to be responsible for transportation therefrom.

    Notwithstanding the foregoing, Buyer agrees to use the Products in its production of ready mix concrete and not to substitute products supplied by other quarries on St. Croix or elsewhere, unless the substitution is required as a result of specifications of a customer of the Buyer, and: (i) the use of the Products, or alternative products that can be produced by the Vendor at its St. Croix quarry, would compromise the particular use for

*Requirements Supply Agreement*
*Page 2*

which the concrete is required; (ii) the use of products from another St. Croix quarry or elsewhere would meet the specifications; and (iii) Vendor is unable to supply the products as "Special Order Products" pursuant to subsection C below.

    B.    Products shall be ordered in commercially reasonable quantities based on the varying needs for the Products required for the Buyer's conduct of its ready-mix concrete business on St. Croix. Buyer agrees to purchase only such quantities of Products as are required for Buyer's Business, and agrees not to resell any Products. Vendor acknowledges and agrees that Buyer's actual requirements for the Products will vary based on actual orders received by Buyer from its customers, orders may be cancelled or not materialize, changes in the economy, and changes in construction activity.

At least two weeks prior to the start of each calendar quarter, Buyer shall provide a written estimate to Vendor of its anticipated requirements for Products for the upcoming quarter. The first such estimate shall be provided on the Effective Date, and the next estimate shall be provided during the second to last week of December, 2013 for the first quarter of 2014 with subsequent estimates provided within the required time frame specified above.

    C.    Should Buyer require delivery of a product of a specific size, volume or dimension not specified on Schedule A ("Special Order Product"), the product specifications shall be supplied to Vendor in writing not less than four weeks prior to the date of expected delivery by the Vendor. Vendor shall advise Buyer within seven days if it is able to supply the specified product. If it is not able to provide the Special Order Product within Buyer's time requirements for delivery, then Buyer shall have the right to acquire the Special Order Product from another supplier.

3.    **PURCHASE PRICE.**

    A.    Vendor's current price list for the Products, less a 10% discount, is shown on Schedule A and made a part of this Agreement. Vendor agrees to sell the Products to the Buyer at the prices set forth on Schedule A. The prices on Schedule A shall not be adjusted, except that Vendor may increase its prices charged to Buyer each January 1 beginning January 1, 2015 by an amount equal to the product of a fraction multiplied times the then existing price for the specified Product ("Existing Price for the Specified Product"), the numerator of which fraction shall be the Current Consumer Price Index and the denominator of which shall be the Previous Consumer Price Index. As used in this Agreement, (i) the term "Consumer Price Index" means the Consumer Price Index for Urban Wage Earners and Clerical Workers (Revised Series), U.S. City Average, All Items (1982-1984 = 100) published by the Bureau of Labor Statistics of the United States Department of Labor in the Current Labor Statistics Section of the Monthly Labor Review (final publication only), (ii) the term "Current Consumer Price Index" means the Consumer Price Index so published for the month of September for the year prior to the year for which prices are being adjusted, and (iii) the term "Previous Consumer Price Index" means the Consumer Price Index so published for the calendar month that is twelve (12) months prior to the calendar month that is the basis for the Current Consumer



000490   00735.030.001

*Requirements Supply Agreement*
*Page 3*

Price Index. In the event that such index shall cease to use the 1982-1984 average of 100 as the basis of calculation, or if a substantial change is made in the terms or number of items contained in the index, then the index shall be adjusted to the figure that would have been arrived at had the change in the manner of computing the index on the date hereof not been altered. In the event that the index shall be discontinued or no longer published, Vendor shall substitute a comparable price index or formula and such substitute price index or formula shall have the same effect as if originally designated herein as the index. The new price calculated as of January 1 as set forth above shall be the new price for such specified Product for such new calendar year. For example, if the price of ASTM #01 Crushed Stone is $25.50 in 2014, and if the CPI Index for September 2013 is 233.9 and the index for September 2014 is 238.578, then the new price for ASTM #01 Crushed Stone for the calendar year 2015 will be $26.06.

      B.    Nothing herein shall prevent the Vendor from selling Products to other parties on St. Croix. Nothing herein shall prevent the Vendor from offering discounts on Products to specific customers. Provided, however, Vendor shall not sell Products to any ready mix concrete supplier on St. Croix at a price lower than the price paid by Buyer.

      C.    If any new or increased tax on the manufacture, importation or sale of the Products shall be imposed by any governmental authority, including but not limited to imposition of gross receipts tax or excise taxes, or increases in customs duties, Port Authority fees, or other similar taxes or fees, the cost thereof shall be borne by the Buyer and added to the price. Buyer acknowledges that Vendor is currently not subject to gross receipts tax because it is an Economic Development program beneficiary. Vendor will use commercially reasonable efforts to retain its gross receipts tax exemption, however, should that benefit be lost, the prices of Products will increase accordingly.

4.    **PAYMENT/DEFAULT.**

      A.    Payment is due upon presentation of Vendor's invoice following or concurrently with delivery of the Product covered by the invoice. Any Products that are not paid for by Buyer in full within 15 days of receipt of the invoice therefor shall accrue interest at a rate of 1.0% per month on the unpaid balance of the Purchase Price until the total amount due, including all accrued interest, is paid in full to Vendor.

      B.    If Buyer fails to pay any invoice within 30 days of issuance, Vendor may, in addition to its other available remedies, suspend further deliveries until all indebtedness of Buyer to Vendor has been paid in full. If a payment default continues for more than 30 days after notice and without cure, or if the Buyer purchases Products in excess of its requirements for production of ready-mix concrete, the Vendor may, at its option, and in addition to its other remedies, terminate this Agreement. If a payment default shall have occurred more than once in any 12 month period, or if the credit of Buyer shall have become impaired, the Vendor may suspend all shipments of Products except upon payment of immediately available funds in advance.



*Requirements Supply Agreement*
*Page 4*

    C.    Vendor shall supply all of the Buyer's Products requirements for the operation of the Buyer's Business and shall deliver to Buyer all ordered Products FOB the Vendor's quarry on the date for pickup of the order as specified by Buyer in the order (unless otherwise agreed upon by Buyer and Vendor). Special Order Products shall be delivered as agreed upon by Buyer and Vendor when the order is placed and accepted by Vendor. If Vendor fails to deliver Products substantially as required herein and such problem is raised by Buyer in writing to Vendor within a reasonable time after such default, and such failure occurs more than twice in any twelve month period, then Buyer may, at its option, and in addition to its other remedies, terminate this Agreement.

**5.    LIMITATION OF LIABILITY.** Neither party shall be liable for incidental, exemplary, or consequential damages. Vendor agrees that the Products shall be to the specifications set forth on Schedule A or as otherwise provided in a specific order pursuant to Paragraph 2C above. VENDOR DOES NOT WARRANT THAT THE PRODUCTS ARE MERCHANTABLE OR FIT FOR ANY PARTICULAR PURPOSE. Vendor shall not be liable for minor variations in Product quality or specifications.

**6.    FORCE MAJEURE.** Neither Vendor nor Buyer shall be responsible for any failure to fulfill the terms of a specific order pursuant to this Agreement resulting from causes beyond the control of the non-performing party and without said party's fault or negligence, including, but not limited to, revolutions, wars, embargoes, strikes, import or export restrictions, federal regulation, fire, floods, acts of God, unusual and severe weather, or any other acts which the parties are unable to prevent. However, financial problems, whatever their cause, shall not excuse performance hereunder.

**7.    RESTRICTIONS.** So long as this Agreement remains in effect, the Vendor (either directly or through any person or entity "affiliated" with Vendor or any of its current owners) agrees not to supply ready-mix concrete on the island of St. Croix. A person or entity shall be considered "affiliated" if the person or entity now or hereafter owns or controls an ownership interest in the Vendor and, together with any other owners of Vendor, owns or controls 5% or more of a business that proposes to supply ready mix concrete on St. Croix. If this Agreement is terminated early because of the Buyer's default, or if the Buyer "substantially decreases" its purchases of the Products hereunder, the Vendor shall be released from the foregoing restriction. As used herein, the term "substantially decreases" means a decrease in the purchase of Products below 50% of Buyer's historical levels of purchases of Products based on the last three years of operations for more than three consecutive months. Vendor shall provide to the Buyer at least thirty (30) days' notice of the existence of this cause to end the restriction, and provided Buyer cures its default or provides satisfactory assurances that it will promptly increase its purchases of Products to within at least 50% of historical levels, the restriction shall not terminate.

**8.    OPTION TO PURCHASE/RIGHT OF FIRST REFUSAL.** During the initial five year term of this Agreement only (and not during any option period), Vendor shall have the option to purchase Buyer's Business for the Agreed Purchase Price. As used herein, the Agreed Purchase Price shall mean $5,000,000. The purchase may be structured as an asset purchase or a purchase of limited liability company interests, at



*Requirements Supply Agreement*
*Page 5*

Vendor's option. Upon notice of the exercise of the option, the parties shall enter into a purchase agreement, whose form shall be negotiated by the parties but which shall include such terms and conditions as are customarily included in contracts for similar transactions in the U.S. Virgin Islands, including the following: (i) a 90 day due diligence period during which the Vendor shall be provided with all available information concerning the Buyer's Business, including financial statements and tax returns; (ii) the absolute right of Vendor not to proceed with the purchase if Vendor determines as a result of its due diligence that the Buyer's Business is not suitable for its purposes; (iii) representations and warranties of Buyer as to the financial condition of the Buyer's Business, litigation matters, environmental matters, liabilities, employment matters, material contracts, compliance with laws, tax matters, insurance and other similar matters customarily included in similar agreements; (iv) exclusive assumption by the Buyer of all liabilities arising or incurred prior to acquisition and appropriate indemnities with respect thereto; (v) appropriate adjustments for accounts receivable, inventory and cash on hand, provided that the Vendor shall not be obligated to purchase any accounts that are delinquent or that Vendor determines have a history of poor performance.

If at any time during the entire term of this Agreement, including any option terms that may be exercised, the Buyer receives an offer to purchase the Buyer's Business which it is prepared to accept (an "Offer"), the Buyer shall provide a copy of the Offer to the Vendor. Vendor may, within 30 business days after being provided the Offer, elect to purchase the Buyer's Business under the terms and condition set forth in the Offer, or pursuant to the terms of the option set forth above, whichever (if any) it selects. If the Vendor does not elect to purchase the Buyer's Business within said 30 business day period, the Buyer may thereafter sell the Buyer's Business pursuant to the terms of the Offer (and not otherwise), subject to all the other terms and conditions of this Agreement, including the option and the right of first refusal.

9.  **SEVERABILITY.** The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions of this Agreement, which shall remain in full force and effect. If any of the covenants or provisions of this Agreement are determined to be unenforceable by reason of its extent, duration, scope or otherwise, then the parties contemplate that the court making such determination shall reduce such extent, duration, scope or other provision and enforce them in their reduced form for all purposes contemplated by this Agreement.

10. **WAIVER.** The rights and remedies of the parties to this Agreement are cumulative and not alternative. Neither the failure nor any delay by any party in exercising any right, power, or privilege under this Agreement will operate as a waiver of such right, power, or privilege, and no single or partial exercise of any such right, power, or privilege will preclude any other or further exercise of such right, power, or privilege or the exercise of any other right, power, or privilege. To the maximum extent permitted by applicable law, (1) no claim or right arising out of this Agreement can be discharged by one party, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by the other party; (2) no waiver that may be given by a party will be applicable except in the specific instance for which it is given; and (3) no notice to or



*Requirements Supply Agreement*
*Page 6*

demand on one party will be deemed to be a waiver of any obligation of such party or of the right of the party giving such notice or demand to take further action without notice or demand as provided in this Agreement.

11. **GOVERNING LAW.** This Agreement shall be construed and enforced in accordance with the laws of the Territory of the United States Virgin Islands without regard to the conflict of law principles. Each party also hereby agrees to submit to the jurisdiction of the territorial or federal courts sitting in the United States Virgin Islands, District of St. Croix for any actions, suits or proceedings arising out of or relating to this Agreement.

12. **NOTICES.** All notices shall be in writing and delivered personally or by registered or certified mail, return receipt requested, postage prepaid, addressed to the addresses on the first page of this Agreement. Either party may, by written notice to the other, change the address to which notices are to be sent. All notices shall be deemed given when actually received, in the case of personal delivery or delivery by overnight courier, or when deposited in any branch, station or depository maintained by the U.S. Postal Service, if sent by registered or certified mail, except that a notice of a change of address shall be deemed given when actually received. Notwithstanding the foregoing, ordinary communications between the parties, such as placing orders or invoicing, may be accomplished by any commercially reasonable method.

13. **SUCCESSORS AND ASSIGNS.** This Agreement shall be binding upon and inure to the benefit of the respective parties, and their successors and assigns. This contract is fully assignable by either party upon notice to the other party, and subject to the specific provisions hereof, including the right of first refusal provision at Section 8.



000494  00735.030.001

*Requirements Supply Agreement*
*Page 7*

IN WITNESS WHEREOF, the parties hereto duly executed this Agreement effective the day and year first above written.

HEAVY MATERIALS, LLC

Date: 12/15/13

By: _____
Doug Gurlea, President

Date: 12·16·13

SPARTAN CONCRETE PRODUCTS, LLC

By: _____
Warren B. Mosler, Manager

*Requirements Supply Agreement*
*Page 8*

## SCHEDULE A

### Produced Products:

| Product | Cost/short ton |
|---|---|
| 1" Coarse Aggregate (ASTM #57) | $23.18 |
| ¼" Coarse Aggregate (ASTM #67) | $24.08 |
| ½" Fine Aggregate (ASTM #7) | $24.53 |
| 3/8" Fine Aggregate (ASTM #8) | $24.53 |
| Manufactured Sand | $29.03 |

*Requirements Supply Agreement*
*Page 8*

000496  00735.030.001